UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**1 CV 5072**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

                v.

JEFFREY DOYLE,

                Defendant.

14 Civ. _____

**COMPLAINT**

JURY TRIAL DEMANDED

## COMPLAINT

International Business Machines Corporation ("IBM" or the "Company"),
by its undersigned attorneys, upon personal knowledge with respect to itself and its
actions and otherwise on information and belief, alleges as follows:

### Nature of the Action

1.      IBM brings this action for injunctive relief and damages against
Jeffrey Doyle, a senior executive who has resigned from IBM to join Accenture plc
("Accenture"), one of IBM's chief competitors, in violation of the noncompetition
agreement that Mr. Doyle signed with IBM in 2011.

2.      Prior to his recent resignation, Mr. Doyle was Vice President,
Mergers & Acquisitions ("M&A"), in IBM's Corporate Development department.  In that
position, he helped develop and was privy to confidential strategies, plans and proposals
for acquisitions, divestitures, investments, and commercial partnerships to help IBM
compete against Accenture and others in all of its major lines of business.  Mr. Doyle also
helped develop and was privy to the confidential and proprietary methods and practices
IBM uses to target, negotiate and integrate acquisitions and investments.

8.      Jeffrey Doyle is an individual who resides in Ridgefield, Connecticut.

## Jurisdiction and Venue

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

10.      The Court has personal jurisdiction over Mr. Doyle because, in the Noncompetition Agreement he signed, he agreed to exclusive jurisdiction and venue in the federal and state courts in New York, Westchester County or County of New York, for all disputes arising from those agreements.

11.      Venue properly lies in this Court both because of Mr. Doyle's aforementioned agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters and principal place of business are situated within this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## Relevant Facts

### IBM

12.      IBM, one of the most widely recognized technology companies in the world, offers information technology ("IT") products and services to a wide range of business and consumer clients, including IT services and consulting.

13.      Like most technology companies and large global businesses, IBM relies on trade secrets, other confidential information and proprietary methods and processes in developing and implementing its acquisition, investment and divestiture

plans and strategies, its competitive sales campaigns, its product and services offerings, and its marketing and sales strategies. Acquisitions and strategic investments are central to IBM's corporate growth and competitive edge, and the Company's acquisition (and divestiture) plans, strategies, targets and pipeline are among the most closely guarded secrets and most competitively sensitive sources of information at IBM. Even inside IBM, few people outside the Corporate Development department have access to or knowledge of IBM's acquisition, investment and divestiture plans.

14.     IBM's principal business segments fall into three categories: Hardware, Software and Services. The Corporate Development department -- in which Mr. Doyle worked as an executive for the past 15 years -- supports each of these business segments by developing and executing mergers and acquisitions, divestitures and investment strategies.

15.     Accenture's competition with IBM focuses primarily on IBM's Services offerings. Accenture also is expanding into Software, including through its recent and ongoing M&A activity.[1] Both companies offer IT and consulting services

---

[1]     Based on publicly available information, in 2013 and 2014 alone Accenture has made numerous acquisitions to bolster its efforts to compete against IBM: Accenture acquired Mortgage Cadence a software company that provides loan origination software solutions, including cloud-based solutions; Accenture acquired ASM Research, a software company that provides a healthcare IT solutions and services, data analytics, data warehousing, cloud-based solutions, and software development; Accenture acquired PRION Group, a software company that specializes in product lifecycle management software; Accenture acquired Evopro, a software company that provides industrial and embedded software solutions capability; Accenture acquired ClientHouse, a software company that provides software implementation services; Accenture acquired Enkitec, a software company that implements database applications; Accenture acquired PureApps, a software company that helps enterprise clients with cost management; Accenture acquired i4C, a software platform provider for business analytics; Accenture acquired PCO Innovation, a company that provides

designed to improve clients' business operations, technology strategies, data center performance, software applications, management functions, finance organizations, and business processes (such as human resources). For example, a business looking to build, expand or improve its human resources department might engage IBM's Services Group for consultation. IBM would deploy consulting professionals with expertise in human resources functions in the specific industry in which the client operates. These IBM consultants first would help the client determine its needs and goals, analyzing the client's workforce strategy and assessing its performances to identify areas for improvement. Then, the IBM consultants would develop, recommend, and implement strategies and solutions tailored to the client's needs. Accenture competes head-to-head with IBM to provide services to the same set of enterprise -- *i.e.*, large business -- customers.

**Jeffrey Doyle**

16. Jeffrey Doyle started working at IBM in May 1991. With the exception of a ten-month period in 1998, Mr. Doyle worked for IBM continuously since that time. Since 1999, Mr. Doyle held positions in IBM's Corporate Development department, with various responsibilities for IBM's M&A activities, including acquisitions, divestitures, strategic partnerships and investments. Among other responsibilities, Mr. Doyle participated in IBM's acquisition of the PricewaterhouseCoopers consulting business, which became known at IBM as Global

---

IT consulting for product lifecycle management in software development; and Accenture acquired Procurian, a software company that provides solutions for procurement of business process outsourcing.

Business Services and part of the IBM Services segment that competes directly against Accenture.

17.     In 2005, Mr. Doyle became the Director of M&A and Venture Investments for IBM in Europe, covering all three of IBM's principal business segments -- Hardware, Software and Services.

18.     In 2011, Mr. Doyle became Vice President, Corporate Development, responsible for strategic acquisitions, investments and divestitures for IBM's Hardware and Services businesses.

19.     In 2013, Mr. Doyle became Vice President, M&A, in IBM's Corporate Development department, responsible for strategic acquisitions, investments, divestitures and partnerships for IBM's Software Group. Mr. Doyle's responsibilities in this role were global in scope. Though his role focused on M&A in the Software Group, Mr. Doyle was privy to and participated in management-level discussions regarding M&A activity and strategies in all of IBM's business segments, including Services, through his participation in weekly and bi-weekly meetings of the Corporate Development Management Team and by virtue of his years of experience supporting the Services business. Mr. Doyle was consulted often by other IBM executives regarding various acquisitions and investments in the Services business.

20.     Among other confidential IBM information in Mr. Doyle's possession, he knows the actual acquisitions, investments and divestitures IBM is working to consummate in the next twelve months in the Services business. He also has knowledge of the pipeline of contemplated transactions in the Software business, for which he was directly responsible until he left on June 30, 2014. This strategic inside

information is not only treated with strict confidentiality within IBM, but it is subject to nondisclosure agreements with the third-parties involved. To avoid the competitive harm that would come to IBM from the disclosure of the business secrets, IBM has acted to ensure that its competitors, including Accenture, do not have access to this confidential information.

21.     Furthermore, Mr. Doyle is familiar with some of the Corporate Development department's most confidential and proprietary information. He knows IBM's pipeline of potential acquisition targets, its planned divestitures and the investments and improvements the Company is making. Mr. Doyle also is familiar with the proprietary processes, methods and practices developed internally by IBM for considering and evaluating potential acquisitions and investments, negotiating terms and conditions, executing deals and integrating acquired companies.

22.     Further, Mr. Doyle knows about IBM's unique methods of integrating companies after they have been acquired by IBM, and he is aware of IBM's competitive integration plans and strategies.

23.     Mr. Doyle also knows about proprietary software -- unique to and developed internally at IBM -- that IBM uses to analyze potential acquisition and investment opportunities. This software gives IBM a competitive edge over its competitors, and Mr. Doyle's knowledge of the software would be of enormous value to Accenture.

24.     In addition, Mr. Doyle cultivated relationships in the financial industry through his IBM employment. He developed strong relationships with the banking sector as a result of his extensive mergers and acquisitions experience, and he

has relationships with representatives from many of the major investment banks. All of Mr. Doyle's banking and investment business relationships were developed during his IBM employment and are valuable to the Company.

25. The confidential and strategic business information in Mr. Doyle's possession represents the product of IBM's investment in both corporate strategies and technological development. Because such competitively sensitive information is central to IBM's current and future business prospects, it is carefully safeguarded and is not made accessible to the public, to IBM's competitors or even to most IBM employees. Most of the confidential information Mr. Doyle knows is closely held as trade secrets within the Company, and is disclosed to IBM employees only on a "need to know" basis.

**Mr. Doyle's Noncompetition Agreement with IBM**

26. Precisely because of his exposure to confidential and commercially sensitive information, Mr. Doyle was one of IBM's senior executives who signed a noncompetition agreement, protecting against the potential disclosure of confidential IBM information and trade secrets in the event that he left the Company.

27. Mr. Doyle executed his Noncompetition Agreement with IBM on January 1, 2011. A true and correct copy of that agreement is attached hereto as Exhibit A.

28. In that agreement, Mr. Doyle acknowledged and agreed that:

during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . , [he] will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company; or (ii) solicit, for competitive business purposes, any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM. (Noncompetition Agreement § 1(c).)

29.     The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

(a)     "Restricted Area" is defined as "any geographic area in the world for which [he] had job responsibilities during the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(d).)

(b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, contractor or otherwise." (*Id.* § 2(c).)

(c)     "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

(d)     "Confidential Information" is defined as including, among other things, information about "certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company." (*Id.* § 1(a).)

30.     Among other things, Mr. Doyle agreed in the Noncompetition Agreement that, if he left IBM, he would wait twelve months before he would work for any competitor of IBM in any geographic area in the world for which he had job responsibilities in the last twelve months of his employment with IBM. (*See id.* § 1(c).)

31.     Additionally, in the Noncompetition Agreement, Mr. Doyle agreed and acknowledged that:

(a)     "the business in which [the Company is] engaged is intensely competitive" (*Id.* § 1(a)(i).);

(b)     his "employment by IBM has required . . . that [he] have access to, and knowledge of, confidential information of the Company" (*Id.*);

(c)     "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)     "the restrictions set forth in [the covenants] are reasonable as to geography, duration and scope." (*Id.*)

**Mr. Doyle's Receipt of Long-Term Incentive**
**Awards Pursuant to Certain Restrictions**

32.     As recently as June 2013, Mr. Doyle accepted awards of IBM Restricted Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 (the "LTPP"). A true and correct copy of the LTPP Prospectus is annexed hereto as Exhibit B. Mr. Doyle's equity awards also were governed by a document titled "Terms and Conditions of Your Equity Award: Effective June 7, 2013" (the "Terms and Conditions"). A true and correct copy of the Terms and Conditions is annexed hereto as Exhibit C.

33.     The equity awards that Mr. Doyle received under the LTPP were in addition to, and not part of, the salary he received for his work at IBM.

34. Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is subject to repayment. In particular, the awards may be canceled and rescinded if the participant engages in "Detrimental Activity," as defined in the LTPP Prospectus. (*See* Ex. B § 13(a).)

35. Detrimental Activity consists of eight categories of conduct, including, among others:

(a) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company;

(b) the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential Information and Intellectual Property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company;

(c) any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; and

(d) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company. (*Id.*)

36.     The LTPP Prospectus also requires Mr. Doyle to pay "all costs and expenses incurred by the Company" in a successful action to enforce the terms of the Plan, "including reasonable attorneys' fees." (*Id.* § 15(f).)

37.     Mr. Doyle had the choice whether to accept his equity awards. Upon acceptance of the awards in June 2013, he agreed that he understood that "IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months." A copy of Mr. Doyle's "Long-Term Incentive Award Acceptance Information" is annexed hereto as Exhibit D.

38.     The stock options that Mr. Doyle exercised and Restricted Stock Units that were released to him in the twelve months prior to his resignation and announcement of his intent to join Accenture total approximately $104,051.

**Mr. Doyle Violates His Noncompetition Agreement by**
**Accepting a Position at Accenture in Competition with IBM**

39.     On June 2, 2014, Mr. Doyle informed IBM that he had accepted a job at Accenture, and announced his resignation from IBM, to become effective June 30, 2014. He subsequently explained that he planned to become Accenture's Managing Director, M&A, responsible for leading all of Accenture's acquisition activity. He also stated that he would be starting at Accenture in early July 2014, rather than waiting for twelve months, as the Noncompetition Agreement requires. Mr. Doyle now plans to commence employment with IBM on July 9, 2014.

40.     In short, Mr. Doyle has agreed with Accenture to help Accenture compete against IBM by taking a similar position with similar responsibilities as the positions he held at IBM. The confidential information and trade secrets Mr. Doyle knows about IBM's acquisition, growth, divestiture and investment plans and strategies as a result of his leadership in IBM's M&A department will be highly relevant to his proposed position in the leadership of Accenture's M&A department, and thus likely to be disclosed to, or used for the benefit of, Accenture to the competitive harm of IBM.

41.     As both Accenture and IBM acknowledge, the companies are among each other's primary competitors. IBM's Form 10-K for 2013 expressly identifies Accenture as one of its chief broad-based competitors in the Global Services area. Accenture competes head-to-head with IBM in the same IT service areas where IBM is planning acquisitions, investments and divestitures. Both companies offer IT and consulting services designed to improve clients' business operations, technology strategies, management functions, M&A work, finance organizations, and business processes (such as human resources). Accenture competes head-to-head with IBM to provide these IT and consulting services to the same set of enterprise business customers. Accenture also is expanding into the Software area through acquisitions, and its recent M&A activity demonstrates Accenture's intent to compete with IBM in the area where Mr. Doyle's knowledge of IBM's trade secrets would be most useful to Accenture.

42.     Thus, in his new position at Accenture, Mr. Doyle will be leading Accenture's M&A efforts in the very same market for which he helped devise and execute IBM's plans and strategies. And he intends to start there almost immediately, rather than wait for twelve months as his Noncompetition Agreement requires.

43.     By accepting the position to do for Accenture what he has been doing for IBM -- but now, in competition with IBM -- Mr. Doyle is doing exactly what he pledged not to do in his Noncompetition Agreement, and what he agreed would cause IBM irreparable harm.

44.     Because the work that Mr. Doyle will be doing for Accenture is so similar to the work he did for IBM, there is a high likelihood that Mr. Doyle will inevitably use or disclose in his work for Accenture the confidential and proprietary information that he learned and used at IBM, including information regarding IBM's strategic acquisitions, investments, divestitures and partnerships.

45.     In view of the competition between IBM and Accenture, there is a substantial risk that, if he commences employment with Accenture in the proposed M&A leadership role prior to June 30, 2015, Mr. Doyle will make use of and/or disclose the confidential information and business secrets he obtained at IBM about IBM's targets, pipeline, methods and techniques and other confidential information, which will provide an unfair competitive advantage to Accenture and cause significant competitive injury to IBM.  For example, Mr. Doyle's use or disclosure of his knowledge regarding IBM's M&A activity and the Company's proprietary, internally developed methods -- even if unintentional -- would give Accenture an unfair opportunity to anticipate and make competitive plans to counter IBM's acquisitions, investments, joint ventures and divestitures; an unfair advantage in its head-to-head competition against IBM for potential acquisition and investment targets; the opportunity to utilize IBM's methods; and the ability based on confidential IBM information, to asses IBM's strengths, weaknesses and negotiating strategy.

46.     The risk of disclosure and/or use of IBM's confidential and proprietary information to such a direct competitor, and the manifest and irreparable harm such disclosure would cause to IBM, is the very interest that IBM sought to safeguard, and Mr. Doyle agreed to honor, in executing the Noncompetition Agreement.

47.     By accepting employment at Accenture, Mr. Doyle also engaged in "Detrimental Activity" under the terms and conditions of the LTPP Agreement, triggering IBM's right to rescind and recover awards granted to him in the prior twelve months.

### COUNT I — Breach of Noncompetition Agreement

48.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 47 above.

49.     The Noncompetition Agreement is an enforceable agreement that imposes upon Mr. Doyle contractual obligations.

50.     IBM has complied with all material terms of the Noncompetition Agreement.

51.     Mr. Doyle has breached the terms of the Noncompetition Agreement by, among other things, accepting a position with Accenture as its Managing Director for Accenture's M&A business without waiting for expiration of the one-year non-compete period to which he agreed.

52.     As Mr. Doyle himself agreed in the Noncompetition Agreement, if he is not enjoined from working in this position at Accenture until June 30, 2015, and thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

53. In view of the similarity of Mr. Doyle's job at Accenture to his job at IBM, he will inevitably (even if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing his job at Accenture.

54. In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury. It is also entitled to recover monetary damages to the extent that Mr. Doyle is not enjoined from violating his agreement.

### COUNT II — Misappropriation of Trade Secrets

55. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 54 above.

56. IBM possesses certain trade secrets and confidential information with which Mr. Doyle is familiar, and which Mr. Doyle has a common law duty not to disclose outside of IBM.

57. If he is permitted to work for Accenture, Mr. Doyle will inevitably (even if inadvertently) use and/or disclose IBM trade secrets for his own benefit and for the benefit of Accenture.

58. As an unavoidable result of Mr. Doyle's impending misappropriation of IBM trade secrets in violation of his common law and contractual duties, IBM will be damaged.

### COUNT III – Declaratory Judgment

59. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 58 above.

indirectly involved as part of his job responsibilities during the last twelve months of his employment with IBM;

B.    Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to Mr. Doyle in the twelve months prior to his accepting employment with Accenture;

C.    Awarding IBM its attorneys' fees, costs and disbursements incurred as a result of this action;

D.    Awarding IBM monetary damages in an amount sufficient to compensate the Company for Mr. Doyle's breaches of contract, together with rescission of any LTPP awards Mr. Doyle has received from IBM within the last twelve months and of any other compensation or benefits that IBM is entitled to rescind; and

E.    Awarding IBM such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Dated:  New York, New York
       July 8, 2014

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____
     Robert A. Atkins
     Maria Keane

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
mkeane@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

# EXHIBIT A

## NONCOMPETITION AGREEMENT

In recognition of the critical role that you will play as a senior executive with International Business Machines Corporation ("IBM") and as consideration for your promotion as a senior executive, and/or for other good and valuable consideration, you ("Employee" or "you") agree to the terms and conditions of this Noncompetition Agreement (this "Agreement") as follows:

1. **Covenants.**

    (a) You acknowledge and agree that: (i) the business in which IBM and its affiliates (collectively, the "Company") are engaged is intensely competitive and that your employment by IBM has required, and will continue to require, that you have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business (collectively, "Confidential Information"); (ii) the disclosure of any of the foregoing would place the Company at a serious competitive disadvantage and would do serious damage, financial and otherwise, to the business of the Company; (iii) you have been given access to, and developed relationships with, customers of the Company at the time and expense of the Company; and (iv) by your training, experience and expertise, your services to the Company are, and will continue to be, extraordinary, special and unique.

    (b) You acknowledge and agree that you will keep in strict confidence, and will not, directly or indirectly, at any time during or after your employment with IBM, disclose, furnish, disseminate, make available or, except in the course of performing your duties of employment, use any trade secrets or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how you may have acquired such

information. Such information shall include, without limitation, the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information. You specifically acknowledge that all such information, whether reduced to writing, maintained on any form of electronic media, or maintained in your mind or memory and whether compiled by the Company, and/or you, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by you during or after your employment with IBM (except in the course of performing your duties and obligations hereunder) shall constitute a misappropriation of the Company's trade secrets.

(c) You acknowledge and agree that during your employment with IBM and for twelve (12) months following the termination of your employment either by you for any reason, by IBM for "Cause," or by IBM without Cause where IBM elects, pursuant to Paragraph 4 below, to make certain severance payments to you, you will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company; or (ii) solicit, for competitive business purposes, any customer of the Company with which you were involved as part of your job responsibilities during the last twelve (12) months of your employment with IBM. You further agree that during your employment with IBM and for the two (2) year period following the termination of your employment by either you or by IBM for any reason, you will not directly or indirectly within the "Restricted Area," hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company.

2

2. **Definitions.**

   (a) For purposes of this Agreement, the term "Business Enterprise" shall mean any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which you worked at any time during the three (3) year period prior to the termination of your employment.

   (b) For purposes of this Agreement, "Cause" shall mean, as reasonably determined by IBM, the occurrence of any of the following: (i) embezzlement, misappropriation of corporate funds or other material acts of dishonesty; (ii) commission or conviction of any felony, or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or nolo contendere to any felony or misdemeanor (other than a minor traffic violation or other minor infraction); (iii) engagement in any activity that you know or should know could harm the business or reputation of the Company; (iv) failure to adhere to the Company's corporate codes, policies or procedures; (v) a breach of any covenant in any employment agreement or any intellectual property agreement, or a breach of any other provision of your employment agreement, in either case if the breach is not cured to the Company's satisfaction within a reasonable period after you are provided with notice of the breach (no notice and cure period is required if the breach cannot be cured), provided, however, that the mere failure to achieve performance objectives shall not constitute Cause; (vi) failure by you to perform your duties or follow management direction, which failure is not cured to the Company's satisfaction within a reasonable period of time after a written demand for substantial performance is delivered to you (no notice or cure period is required if the failure to perform cannot be cured); or (vii) violation of any statutory, contractual or common law duty or obligation to the Company, including without limitation the duty of loyalty.

   (c) For purposes of this Agreement, the phrase "Engage in or Associate with" shall include without limitation engagement or association as a sole proprietor, owner, employer, director, partner, principal, investor, joint venture, shareholder, associate, employee, member, consultant, contractor or

otherwise

      (d) For purposes of this Agreement, the term "Restricted Area" shall mean any geographic area in the world for which you had job responsibilities during the last twelve (12) months of your employment with IBM.

3.     **Acknowledgements**.

      You acknowledge that the Company would suffer irreparable harm if you fail to comply with Paragraph 1, and that the Company would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees. You further acknowledge that enforcement of the covenants in Paragraph 1 is necessary to ensure the protection and continuity of the business and goodwill of the Company and that, due to the proprietary nature of the business of the Company, the restrictions set forth in Paragraph 1 are reasonable as to geography, duration and scope.

4.     **Termination without Cause**.

      In the event that IBM terminates your employment without Cause, IBM may elect in its sole discretion to offer to you severance payments (in an amount and on terms that IBM will determine, and disclose to you, prior to your termination of employment) in accordance with IBM's regular payroll practices and subject to all applicable foreign, federal, state and local withholdings or other taxes that IBM may from time to time be required to withhold. In the event you agree to such payments and without limiting the generality of the foregoing, IBM may cease making such payments under this Paragraph 4 if IBM believes that you are in breach of any of your obligations in this Agreement. Without prejudice to any other remedies under this Agreement or under applicable law, IBM may also seek to recoup any payments made to you under this Paragraph 4 if you breach any of your obligations under this Agreement.

5.      **LTPP Awards.**

For purposes of the IBM Corporation Long-Term Performance Plan ("LTPP") and any awards thereunder (including any awards outstanding on the date of this Agreement) (collectively, the "LTPP Awards"), if you engage in conduct in breach of this Agreement prior to, or within twelve (12) months after, any delivery or payout pursuant to any LTPP Awards, then such conduct shall also be deemed to be a breach of the terms of such LTPP Awards, justifying cancellation or rescission of any such LTPP Awards.

6.      **Injunctive Relief**.

You agree that the Company would suffer irreparable harm if you were to breach, or threaten to breach, any provision of this Agreement and that the Company would by reason of such breach, or threatened breach, be entitled to injunctive relief in a court of appropriate jurisdiction, without the need to post any bond, and you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement. This Paragraph 6 shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

7.      **Severability**.

In the event that any one or more of the provisions of this Agreement shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law. Furthermore, a determination in any jurisdiction that this Agreement, in whole or in part, is invalid or unenforceable shall not in any way affect or impair the validity or enforceability of this Agreement in any other jurisdiction.

8.  **Captions**.

The captions in this Agreement are inserted for convenience and reference only and shall in no way affect, define, limit or describe the scope, intent or construction of any provision hereof.

9.  **Waiver.**

The failure of IBM to enforce any terms, provisions or covenants of this Agreement shall not be construed as a waiver of the same or of the right of IBM to enforce the same. Waiver by IBM of any breach or default by you (or by any other employee or former employee of IBM) of any term or provision of this Agreement (or any similar agreement between IBM and you or any other employee or former employee of IBM) shall not operate as a waiver of any other breach or default.

10. **Successors and Assigns.**

This Agreement shall inure to the benefit of and be binding upon IBM, any successor organization which shall succeed to IBM by acquisition, merger, consolidation or operation of law, or by acquisition of assets of IBM and any assigns. You may not assign your obligations under this Agreement.

11. **Disclosure of Existence of Covenants.**

You agree that while employed by IBM and for two (2) years thereafter, you will communicate the contents of this Agreement to any person, firm, association, partnership, corporation or other entity which you intend to be employed by, associated with or represent.

12. **Notice to IBM of Prospective Position.**

You agree that you will promptly notify the Senior Vice President of Human Resources for IBM Corporation if, at any time during your employment or within twelve months following the termination of your employment with IBM, you accept a position to be employed by, associated with

or represent any person, firm, association, partnership, corporation or other entity. You further agree that you will provide IBM with such information as IBM may request about your new position to allow IBM to determine whether such position and duties would likely lead to a violation of this Agreement (except that you need not provide any information that would constitute confidential or trade secret information).

13. **No Oral Modification**.

This Agreement may not be changed orally, but may be changed only in a writing signed by the Employee and a duly authorized representative of IBM.

14. **Entire Agreement**.

Although this Agreement sets forth the entire understanding between the Employee and IBM concerning its subject matter, this Agreement does not impair, diminish, restrict or waive any other restrictive covenant, nondisclosure obligation or confidentiality obligation of the Employee to IBM under any other agreement, policy, plan or program of IBM. The Employee and IBM represent that, in executing this Agreement, the Employee and IBM have not relied upon any representations or statements made, other than those set forth herein, with regard to the subject matter, basis or effect of this Agreement.

15. **Governing Law and Choice of Forum**.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules. The parties acknowledge that the state and federal courts in New York and Westchester Counties have substantial experience in commercial disputes, including noncompetition and other employment related matters. For this reason, the parties agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the state and federal courts sitting in New York County or Westchester County, New York. The parties agree to the personal

7

jurisdiction thereof, and irrevocably waive any objection to the venue of such action, including any objection that the action has been brought in an inconvenient forum.

_Jeffrey J. Doyle_

Jeffrey Doyle (Print)

_(signature)_

Jeffrey Doyle (Signature)

1\1\2011

Date

INTERNATIONAL BUSINESS
MACHINES CORPORATION

By: _(signature)_

J. Randall MacDonald
Senior VP - Human Resources

# EXHIBIT B

PROSPECTUS

**International Business Machines Corporation**

**1999 Long-Term Performance Plan**

118,671,300 shares

Capital Stock, $.20 Par Value

**THE SECURITIES AND EXCHANGE COMMISSION AND STATE SECURITIES
REGULATORS HAVE NOT APPROVED OR DISAPPROVED THESE SECURITIES,
OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

This document constitutes part of a prospectus covering securities that have been registered
under the Securities Act of 1933.

March 15, 2000, as amended through August 1, 2007

## GENERAL INFORMATION ABOUT THE PLAN

For detailed information regarding the 1999 Long-Term Performance Plan, reference is made to the terms of the Plan itself, which is included in this Prospectus in its entirety. The Plan was approved by the Company's stockholders at the Company's 1999 Annual Meeting on April 27, 1999. All share references in the Plan have been adjusted to reflect a two-for-one stock split as of May 10, 1999. Terms used herein without definition shall have the definitions set forth in the Plan. IBM has also filed a registration statement with the SEC (SEC File 333-30424) registering the shares of IBM common stock to be offered under the Plan.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus.

Administration

The Plan is administered by a Committee designated by the IBM Board of Directors, currently the Executive Compensation and Management Resources Committee. This Committee is composed entirely of outside directors, who are elected to hold office until the next Annual Meeting of Stockholders and until their successors shall have qualified. The Plan is not subject to the Employee Retirement Income Security Act of 1974 and is not qualified under Section 401(a) of the Code. Additional information about the Plan and its administration may be obtained from the Vice President, Compensation & Benefits, IBM Corporation, New Orchard Road, Armonk, New York 10504, (914) 499-4148.

WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we file at the SEC's public reference rooms in Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at the SEC's web site at (http://www.sec.gov).

The SEC allows us to "incorporate by reference" into this prospectus the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information that we file with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until our offering is completed:

i. Annual Report on Form 10-K for the year ended December 31, 2006;

ii. Quarterly Reports on Form 10-Q, filed on April 24, 2007 and July 31, 2007; and

iii. Current Reports on Form 8-K, filed on January 18, 2007, January 19, 2007, January 25, 2007, January 31, 2007, February 5, 2007, March 21, 2007, April 17, 2007, April 18, 2007, April 24, 2007, April 27, 2007, May 29, 2007, June 4, 2007, June 26, 2007, July 18, 2007 July 19, 2007, and August 1, 2007.

You may request a copy of these filings at no cost, by writing to or telephoning our transfer agent at the following address:

Computershare Trust Company, N.A.
P.O. Box 43072
Providence, Rhode Island 02940
(781) 575-2727

---

# IBM 1999 Long-Term Performance Plan

1. Objectives.

The IBM 1999 Long-Term Performance Plan (the "Plan") is designed to attract, motivate and retain selected employees of, and other individuals providing services to, the Company. These objectives are accomplished by making long-term incentive and other awards under the Plan, thereby providing Participants with a proprietary interest in the growth and performance of the Company.

2. Definitions.

(a) "Awards"—The grant of any form of stock option, stock appreciation right, stock or cash award, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions, performance requirements, limitations and restrictions as the Committee may establish in order to fulfill the objectives of the Plan.

(b) "Award Agreement"—An agreement between the Company and a Participant that sets forth the terms, conditions, performance requirements, limitations and restrictions applicable to an Award.

(c) "Board"—The Board of Directors of International Business Machines Corporation ("IBM").

(d) "Capital Stock" or "stock"—Authorized and issued or unissued Capital Stock of IBM, at such par value as may be established from time to time.

(e) "Code"—The Internal Revenue Code of 1986, as amended from time to time.

(f) "Committee"—The committee designated by the Board to administer the Plan.

(g) "Company"—IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest.

(h) "Fair Market Value"—The average of the high and low prices of Capital Stock on the New York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were made on said exchange on that date, the average of the high and low prices of Capital Stock as reported for the most recent preceding day on which sales of Capital Stock were made on said exchange.

(i) "Participant"—An individual to whom an Award has been made under the Plan. Awards may be made to any employee of, or any other individual providing services to, the Company. However, incentive stock options may be granted only to individuals who are employed by IBM or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM, including a subsidiary that becomes such after the adoption of the Plan.

(j) "Performance Period"—A multi-year period of no more than five consecutive calendar years over which one or more of the performance criteria listed in Section 6 shall be measured pursuant to the grant of Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash). Performance Periods may overlap one another, but no two Performance Periods may consist solely of the same calendar years.

3. Capital Stock Available for Awards.

The number of shares that may be issued under the Plan for Awards granted wholly or partly in stock during the term of the Plan is 118,671,300. In addition, any shares previously authorized by stockholders for awards under prior Company long-term performance plans which are still available for issuance or which either wholly or in part were not earned or that expired or were forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards shall be available for issuance under the Plan. Shares of Capital Stock may be made available from the authorized but unissued shares of the Company or from shares held in the Company's treasury and not reserved for some other purpose. For purposes of determining the number of shares of Capital Stock issued under the Plan, no shares shall be deemed issued until they are actually delivered to a Participant, or such other person in accordance with Section 10. Shares covered by Awards that either wholly or in part are not earned, or that expire or are forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards, shall be available for future issuance under Awards. Further, shares tendered to or withheld by the Company in connection with the exercise of stock options, or the payment of tax withholding on any Award, shall also be available for future issuance under Awards.

4. Administration.

The Plan shall be administered by the Committee, which shall have full power to select Participants, to interpret the Plan, to grant waivers of Award restrictions, to continue, accelerate or suspend exercisability, vesting or payment of an Award and to adopt such rules, regulations and guidelines for carrying out the Plan as it may deem necessary or proper. These powers include, but are not limited to, the adoption of modifications, amendments, procedures, subplans and the like as necessary to comply with provisions of the laws and regulations of the countries in which the Company operates in order to assure the viability of Awards granted under the Plan and to enable Participants regardless of where employed to receive advantages and benefits under the Plan and such laws and regulations.

5. Delegation of Authority.

The Committee may delegate to officers of the Company its duties, power and authority under the Plan pursuant to such conditions or limitations as the Committee may establish, except that only the Committee or the Board may select, and grant Awards to, Participants who are subject to Section 16 of the Securities Exchange Act of 1934.

## 6. Awards.

The Committee shall determine the type or types of Award(s) to be made to each Participant and shall set forth in the related Award Agreement the terms, conditions, performance requirements, and limitations applicable to each Award. Awards may include but are not limited to those listed in this Section 6. Awards may be granted singly, in combination or in tandem. Awards may also be made in combination or in tandem with, in replacement or payment of, or as alternatives to, grants, rights or compensation earned under any other plan of the Company, including the plan of any acquired entity. During any five-year period, no Participant may receive, under the Plan, stock options or stock appreciation rights with respect to an aggregate of more than 10,000,000 shares. With regard to any "covered employee" (as defined by section 162(m) of the Code), the maximum number of shares of Capital Stock or share equivalents of Capital Stock (stock units) that can be earned by any Participant for any Performance Period is 400,000 shares, subject to adjustment for changes in corporate capitalization, such as a stock split, and if an Award is denominated in cash rather than in shares of Capital Stock or stock units, the share equivalent for purposes of the maximum will be determined by dividing the highest amount that the Award could be under the formula for such Performance Period by the closing price of a share of Capital Stock on the first trading day of the Performance Period.

(a) Stock Option—A grant of a right to purchase a specified number of shares of Capital Stock the exercise price of which shall be not less than 100% of Fair Market Value on the date of grant of such right, as determined by the Committee, provided that, in the case of a stock option granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the exercise price may be the same as the purchase or designated price of such other award. A stock option may be in the form of an incentive stock option ("ISO") which, in addition to being subject to applicable terms, conditions and limitations established by the Committee, complies with section 422 of the Code. The number of shares of stock that shall be available for issuance under ISOs granted under the Plan is limited to twenty million.

(b) Stock Appreciation Right—A right to receive a payment, in cash and/or Capital Stock, equal in value to the excess of the Fair Market Value of a specified number of shares of Capital Stock on the date the stock appreciation right (SAR) is exercised over the grant price of the SAR, which shall not be less than 100% of the Fair Market Value on the date of grant of such SAR, as determined by the Committee, provided that, in the case of a SAR granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the grant price may be the same as the exercise or designated price of such other award.

(c) Stock Award—An Award made in stock and denominated in units of stock. All or part of any stock award may be subject to conditions established by the Committee, and set forth in the Award Agreement, which may include, but are not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance. An Award made in stock or denominated in units of stock that is subject to restrictions on transfer and/or forfeiture provisions may be referred to as an Award of "Restricted Stock," "Restricted Stock Units" or "Long-Term Performance Incentive" units.

(d) Cash Award—An Award denominated in cash with the eventual payment amount subject to future service and such other restrictions and conditions as may be established by the Committee, and as set forth in the Award Agreement, including, but not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance.

(e) Performance Criteria under section 162(m) of the Code for Long-Term Performance Incentive Awards—The performance criteria for Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash) made to any "covered employee" (as defined by section 162(m) of the Code) shall consist of objective tests based on one or more of the following: earnings, cash flow, customer satisfaction, revenues, financial return ratios, market performance, shareholder return and/or value, operating profits (including EBITDA), net profits, earnings per share, profit returns and margins, stock price and working capital. Performance criteria may be measured solely on a corporate, subsidiary or business unit basis, or a combination thereof. Further, performance criteria may reflect absolute entity performance or a relative comparison of entity performance to the performance of a peer group of entities or other external measure of the selected performance criteria. The formula for any Award may include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary gains or losses, the cumulative effect of accounting changes, acquisitions or divestitures, foreign exchange impacts and any unusual, nonrecurring gain or loss. Nothing herein shall preclude the Committee from making any payments or granting any Awards whether or not such payments or Awards qualify for tax deductibility under section 162(m) of the Code.

7. Payment of Awards.

Payment of Awards may be made in the form of cash, stock or combinations thereof and may include such restrictions as the Committee shall determine. Further, with Committee approval, payments may be deferred, either in the form of installments or as a future lump-sum payment, in accordance with such procedures as may be established from time to time by the Committee. Any deferred payment, whether elected by the Participant or specified by the Award Agreement or the Committee, may require the payment to be forfeited in accordance with the provisions of Section 13. Dividends or dividend equivalent rights may be extended to and made part of any Award denominated in stock or units of stock, subject to such terms, conditions and restrictions as the Committee may establish. The Committee may also establish rules and procedures for the crediting of interest on deferred cash payments and dividend equivalents for deferred payments denominated in stock or units of stock. At the discretion of the Committee, a Participant may be offered an election to substitute an Award for another Award or Awards of the same or different type.

8. Stock Option Exercise.

The price at which shares of Capital Stock may be purchased under a stock option shall be paid in full in cash at the time of the exercise or, if permitted by the Committee, by means of tendering Capital Stock or surrendering another Award or any combination thereof. The Committee shall determine acceptable methods of tendering Capital Stock or other Awards and may impose such conditions on the use of Capital Stock or other Awards to exercise a stock option as it deems appropriate.

9. Tax Withholding.

Prior to the payment or settlement of any Award, the Participant must pay, or make arrangements acceptable to the Company for the payment of, any and all federal, state and local tax withholding that in the opinion of the Company is required by law. The Company shall have the right to deduct applicable taxes from any Award payment and withhold, at the time of delivery or vesting of shares under the Plan, an appropriate number of shares for payment of taxes required by law or to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for withholding of such taxes.

10. Transferability.

No Award shall be transferable or assignable, or payable to or exercisable by, anyone other than the Participant to whom it was granted, except (i) by law, will or the laws of descent and distribution, (ii) as a result of the disability of a Participant or (iii) that the Committee (in the form of an Award Agreement or otherwise) may permit transfers of Awards by gift or otherwise to a member of a Participant's immediate family and/or trusts whose beneficiaries are members of the Participant's immediate family, or to such other persons or entities as may be approved by the Committee.

Notwithstanding the foregoing, in no event shall ISOs be transferable or assignable other than by will or by the laws of descent and distribution.

11. Amendment, Modification, Suspension or Discontinuance of the Plan.

The Board may amend, modify, suspend or terminate the Plan for the purpose of meeting or addressing any changes in legal requirements or for any other purpose permitted by law. Subject to changes in law or other legal requirements that would permit otherwise, the Plan may not be amended without the consent of the holders of a majority of the shares of Capital Stock then outstanding, to (i) increase the aggregate number of shares of Capital Stock that may be issued under the Plan (except for adjustments pursuant to Section 14 of the Plan), or (ii) permit the granting of stock options or SARs with exercise or grant prices lower than those specified in Section 6.

12. Termination of Employment.

If the employment of a Participant terminates, other than as a result of the death or disability of a Participant, all unexercised, deferred and unpaid Awards shall be canceled immediately, unless the Award Agreement provides otherwise. In the event of the death of a Participant or in the event a Participant is deemed by the Company to be disabled and eligible for benefits under the terms of the IBM Long-Term Disability Plan (or any successor plan or similar plan of another employer), the Participant's estate, beneficiaries or representative, as the case may be, shall have the rights and duties of the Participant under the applicable Award Agreement.

13. Cancellation and Rescission of Awards.

(a) Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant is not in compliance with all applicable provisions of the Award Agreement and the Plan, or if the Participant engages in any "Detrimental Activity." For purposes of this Section 13, "Detrimental Activity" shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company; (ii) the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential Information and Intellectual Property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company; (iii) the failure or refusal to disclose promptly and to assign to the Company, pursuant to the Company's Agreement Regarding Confidential Information and Intellectual Property, all right, title and interest in any invention or idea, patentable or not, made or conceived by the Participant during employment by the Company, relating in any manner to the actual or anticipated business, research or development work of the Company or the failure or refusal to do anything reasonably necessary to enable the Company to secure a patent where appropriate in the United States and in other countries; (iv) activity that results in termination of the Participant's employment for cause; (v) a violation of any rules, policies, procedures or guidelines of the Company, including but not limited to the Company's Business Conduct Guidelines; (vi) any attempt directly or indirectly to induce any employee of the Company to be employed or perform services elsewhere or any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; (vii) the Participant being convicted of, or entering a guilty plea with respect to, a crime, whether or not connected with the Company; or (viii) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

(b) Upon exercise, payment or delivery pursuant to an Award, the Participant shall certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan. In the event a Participant fails to comply with the provisions of paragraphs (a)(i)-(viii) of this Section 13 prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise, payment or delivery. In the event of any such rescission, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery, in such manner and on such terms and conditions as may be required, and the Company shall be entitled to set-off against the amount of any such gain any amount owed to the Participant by the Company. As used herein, Rescission Period shall mean that period of time established by the Committee which shall not be less than 6 months after any exercise, payment or delivery pursuant to an Award.

14. Adjustments.

In the event of any change in the outstanding Capital Stock of the Company by reason of a stock split, stock dividend, combination or reclassification of shares, recapitalization, merger, or similar event, the Committee may adjust proportionately: (a) the number of shares of Capital Stock (i) available for issuance under the Plan, (ii) available for issuance under ISOs, (iii) for which Awards may be granted to an individual Participant set forth in Section 6, and (iv) covered by outstanding Awards denominated in stock or units of stock; (b) the exercise and grant prices related to outstanding Awards; and (c) the appropriate Fair Market Value and other price determinations for such Awards. Notwithstanding the foregoing, in the event of any change in the outstanding Capital Stock of the Company by reason of a stock split or a reverse stock split, the above-referenced proportionate adjustments, if applicable, shall be mandatory.

In the event of any other change affecting the Capital Stock or any distribution (other than normal cash dividends) to holders of Capital Stock, such adjustments in the number and kind of shares and the exercise, grant and conversion prices of the affected Awards as may be deemed equitable by the Committee, including adjustments to avoid fractional shares, shall be made to give proper effect to such event. In the event of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation, the Committee shall be authorized to cause IBM to issue or assume stock options, whether or not in a transaction to which section 424(a) of the Code applies, by means of substitution of new stock options for previously issued stock options or an assumption of previously issued stock options. In such event, the aggregate number of shares of Capital Stock available for issuance under awards under Section 3, including the individual Participant maximums set forth in Section 6 will be increased to reflect such substitution or assumption.

15. Miscellaneous.

(a) Any notice to the Company required by any of the provisions of the Plan shall be addressed to the chief human resources officer of IBM in writing, and shall become effective when it is received.

(b) The Plan shall be unfunded and the Company shall not be required to establish any special account or fund or to otherwise segregate or encumber assets to ensure payment of any Award.

(c) Nothing contained in the Plan shall prevent the Company from adopting other or additional compensation arrangements or plans, subject to shareholder approval if such approval is required, and such arrangements or plans may be either generally applicable or applicable only in specific cases.

(d) No Participant shall have any claim or right to be granted an Award under the Plan and nothing contained in the Plan shall be deemed or be construed to give any Participant the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any Participant at any time without regard to the effect such discharge may have upon the Participant under the Plan. Except to the extent otherwise provided in any plan or in an Award Agreement, no Award under the Plan shall be deemed compensation for purposes of computing benefits or contributions under any other plan of the Company.

(e) The Plan and each Award Agreement shall be governed by the laws of the State of New York, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Unless otherwise provided in the Award Agreement, recipients of an Award under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement.

(f) In the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees, and all further costs and fees, including reasonable attorneys' fees incurred by the Company in connection with collection.

(g) The Committee and any officers to whom it may delegate authority under Section 5 shall have full power and authority to interpret the Plan and to make any determinations thereunder, including determinations under Section 13, and the Committee's or such officer's determinations shall be binding and conclusive. Determinations made by the Committee or any such officer under the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

(h) If any provision of the Plan is or becomes or is deemed invalid, illegal or unenforceable in any jurisdiction, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended or limited in scope to conform to applicable laws or, in the discretion of the Committee, it shall be stricken and the remainder of the Plan shall remain in full force and effect.

(i) The Plan shall become effective on the date it is approved by the requisite vote of the stockholders of the Company.

IBM 1999 Long-Term Performance Plan — Federal Income Tax Consequences

The Company has been advised by counsel that, in general, under the Internal Revenue Code, as presently in effect, a Participant will not be deemed to recognize any income for federal income tax purposes at the time an option or SAR is granted or a restricted stock award is made, nor will the Company be entitled to a tax deduction at that time. However, when any part of an option or SAR is exercised, when restrictions on restricted stock lapse, or when an unrestricted stock award is made, the federal income tax consequences may be summarized as follows:

1. In the case of an exercise of a stock option other than an ISO, the optionee will generally recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the exercise date over the option price.

2. In the case of an exercise of a SAR, the Participant will generally recognize ordinary income on the exercise date in an amount equal to any cash and the fair market value of any unrestricted shares received.

3. In the case of an exercise of an option or SAR payable in restricted stock, or in the case of an award of restricted stock, the immediate federal income tax effect for the recipient will depend on the nature of the restrictions. Generally, the fair market value of the stock will not be taxable to the recipient as ordinary income until the year in which his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. However, the recipient may elect to recognize income when the stock is received, rather than when his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. If the recipient makes this election, the amount taxed to the recipient as ordinary income is determined as of the date of receipt of the restricted stock.

4. In the case of ISOs, there is generally no tax liability at time of exercise. However, the excess of the fair market value of the stock on the exercise date over the option price is included in the optionee's income for purposes of the alternative minimum tax. If no disposition of the ISO stock is made before the later of one year from the date of exercise and two years from the date of grant, the optionee will realize a capital gain or loss upon a sale of the stock, equal to the difference between the option price and the sale price. If the stock is not held for the required period, ordinary income tax treatment will generally apply to the excess of the fair market value of the stock on the date of exercise (or, if less, the amount of gain realized on the disposition of the stock) over the option price, and the balance of any gain or any loss will be treated as capital gain or loss. In order for ISOs to be treated as described above, the Participant must remain employed by the Company (or a subsidiary in which the Company holds at least 50 percent of the voting power) from the ISO grant date until three months before the ISO is exercised. The three-month period is extended to one year if the Participant's employment terminates on account of disability. If the Participant does not meet the employment requirement, the option will be treated for federal income tax purposes as an option as described in paragraph 5 below. A Participant who exercises an ISO might also be subject to an alternative minimum tax.

5. Upon the exercise of a stock option other than an ISO, the exercise of a SAR, the award of stock, or the recognition of income on restricted stock, the Company will generally be allowed an income tax deduction equal to the ordinary income recognized by a Participant. The Company will not receive an income tax deduction as a result of the exercise of an ISO, provided that the ISO stock is held for the required period as described above. When a cash payment is made pursuant to the Award, the recipient will recognize the amount of the cash payment as ordinary income, and the Company will generally be entitled to a deduction in the same amount.

6. Pursuant to section 162(m) of the Code and underlying guidance, the Company may not deduct compensation of more than $1,000,000 that is paid in a taxable year to an individual who, on the last day of the taxable year, is the Company's chief executive officer or among one of its three other highest compensated officers for that year, not including the Company's chief financial officer. The deduction limit, however, does not apply to certain types of compensation, including qualified performance-based compensation. The Company believes that compensation attributable to stock options and stock appreciation rights granted under the Plan should qualify as performance-based compensation and therefore should not be subject to the deduction limit. The Plan also authorizes the grant of long-term performance incentive awards utilizing the performance criteria set forth in the Plan that may likewise qualify as performance-based awards.

[END OF PROSPECTUS]

# EXHIBIT C

**IBM**

# TERMS AND CONDITIONS OF YOUR EQUITY AWARD: EFFECTIVE JUNE 7, 2013

# Terms and Conditions of Your Equity Award

## Table of Contents

| | Page |
|---|---|
| 1. Introduction......................................................................... | 2 |
| 2. How to Use This Document................................................ | 2 |
| 3. Definition of Terms.......................................................... | 3 |
| 4. Provisions that apply to all Award types and all countries.......... | 4 |
| 5. Provisions that apply to all Award types but not all countries...... | 5 |

6. Provisions that apply to specific Award types for all countries
   a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs
   and Retention RSUs ("RRSUs")…….................................. 6
      i. All RSUs
      ii. RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs
      iii. Cash-Settled RSUs including Cash-Settled RRSUs
   b. Restricted Stock.............................................................. 7
   c. Stock Options ("Options") and Stock Appreciation Rights ("SARs").. 9
      i. All Option and SAR Awards
      ii. All SAR Awards
   d. Performance Share Units ("PSUs")…….......................... 11

7. Provisions that apply to specific countries............................. 12
   a. Denmark

# Terms and Conditions of Your Equity Award

## Introduction

This document provides you with the terms and conditions of your Award that are in addition to the terms and conditions contained in your Equity Award Agreement for your specific Award. Also, your Award is subject to the terms and conditions in the governing plan document; the applicable document is indicated in your Equity Award Agreement and can be found at http://w3.ibm.com/hr/exec/comp/eq_prospectus.shtml.

As an Award recipient, you can see a personalized summary of all your outstanding equity grants in the "Personal statement" section of the IBM executive compensation web site (http://w3.ibm.com/hr/exec/comp). This site also contains other information about long-term incentive awards, including copies of the prospectus (the governing plan document). If you have additional questions and you are based in the U.S., you can call the Employee Service Center at 800-796-9876 (or 919-784-8646) weekdays, from 8: 00 a.m. to 8: 00 p.m. Eastern time (TTY available at 800-426-6537). If you are based in another country you can call your local IBM Employee Service Center.

## How to Use This Document
Terms and conditions that apply to all awards in all countries can be found on page 4. Review these in addition to any award- or country-specific terms and conditions that may be listed. Once you have reviewed these general terms, check in your Equity Award Agreement for any award-specific and/or country-specific terms that apply to your Award.

## Terms and Conditions of Your Equity Award:
## Definition of Terms

The following are defined terms in the Long-Term Performance Plan and/or your Equity Award Agreement. These are provided for your information. See the Plan prospectus and your Equity Award Agreement for more details.

"Awards" -- The grant of any form of stock option, stock appreciation right, stock or cash award, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions, performance requirements, limitations and restrictions as the Committee may establish in order to fulfill the objectives of the Plan.

"Board" -- The Board of Directors of International Business Machines Corporation ("IBM").

"Capital Stock" -- Authorized and issued or unissued Capital Stock of IBM, at such par value as may be established from time to time.

"Committee" -- The committee designated by the Board to administer the Plan.

"Company" – IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest.

"Equity Award Agreement" – The document provided to the Participant which provides the grant details.

"Fair Market Value" -- The average of the high and low prices of Capital Stock on the New York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were made on said exchange on that date, the average of the high and low prices of Capital Stock as reported for the most recent preceding day on which sales of Capital Stock were made on said exchange.

"Participant" -- An individual to whom an Award has been made under the Plan. Awards may be made to any employee of, or any other individual providing services to, the Company. However, incentive stock options may be granted only to individuals who are employed by IBM or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM, including a subsidiary that becomes such after the adoption of the Plan.

"Plan" -- Any IBM Long-Term Performance Plan.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to all Award types but not all countries

The following terms apply to all countries and for all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units).

### Cancellation and Rescission

All determinations regarding enforcement, waiver or modification of the cancellation and rescission and other provisions of the Plan and your Equity Award Agreement (including the provisions relating to termination of employment, death and disability) shall be made in IBM's sole discretion. Determinations made under your Equity Award Agreement and the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

You agree that the cancellation and rescission provisions of the Plan and your Equity Award Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture of your Award is the penalty for violation.

### Jurisdiction, Governing Law, Expenses and Taxes

Your Equity Award Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. You submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve all issues that may arise out of or relate to your Equity Award Agreement.

If any court of competent jurisdiction finds any provision of your Equity Award Agreement, or portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of your Equity Award Agreement shall continue in full force and effect.

If you or the Company brings an action to enforce your Equity Award Agreement and the Company prevails, you will pay all costs and expenses incurred by the Company in connection with that action and in connection with collection, including reasonable attorneys' fees.

If the Company, in its sole discretion, determines that it has incurred or will incur any obligation to withhold taxes as a result of your Award, without limiting the Company's rights under Section 9 of the Plan, the Company may withhold the number of shares that it determines is required to satisfy such liability and/or the Company may withhold amounts from other compensation to the extent required to satisfy such liability under federal, state, provincial, local, foreign or other tax laws. To the extent that such amounts are not withheld, the Company may require you to pay to the Company any amount demanded by the Company for the purpose of satisfying such liability.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to all Award types but not all countries

The following provision applies to all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units) granted to all individuals in all countries except those with a home country of Latin America, specifically: Argentina, Bolivia, Brazil, Chile, Columbia, Costa Rica, Ecuador, Mexico, Paraguay, Peru, Uruguay, and Venezuela.

### Non-Solicitation

In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company. Also, you agree that during your employment with the Company and for one year following the termination of your employment for any reason, you will not directly or indirectly, solicit, for competitive business purposes, any customer of the Company with which you were involved as part of your job responsibilities during the last year of your employment with the Company. By accepting your Award, you acknowledge that the Company would suffer irreparable harm if you fail to comply with the foregoing, and that the Company would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

## a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs and Retention RSUs ("RRSUs")

All references in this document to RSUs include RRSUs, unless explicitly stated otherwise

### i. All RSUs

#### Termination of Employment including Death, Disability and Leave of Absence

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) set in your Equity Award Agreement, all then unvested RSUs, including RRSUs, under your Award shall be canceled.

However, your unvested and/or outstanding RSUs, but not RRSUs, will continue to vest upon the termination of employment if all of the following criteria are met:

- You are on the performance team, or any successor team thereto, at the time of termination of employment;
- You have completed at least one year of active service since the award date of grant;
- You have reached age 55 with 15 years of service at the time of termination of employment (age 60 with 15 years of service for the Chairman and CEO); and
- Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the vesting of the RSUs.

*Death or Disability*
Upon your death all RSUs covered by this Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your RSUs shall continue to vest according to the terms of your Award.

*Leave of Absence*
In the event of a management approved leave of absence, any unvested RSUs shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to

active status, your unvested RSUs will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

**Dividend Equivalents**
IBM shall not pay dividend equivalents on cash-settled or stock-settled unvested RSU awards.

### ii. RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the section "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, IBM shall make a payment to Participant in shares of Capital Stock equal to the number of vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

### iii. Cash-Settled RSUs including Cash-Settled RRSUs

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the section entitled "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the Company shall make a payment to Participant in cash equal to the Fair Market Value of the vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. Fair Market Value will be calculated in your home country currency at the exchange rate on the applicable Vesting Date using a commercially reasonable measure of exchange rate. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

## b. Restricted Stock

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the paragraph entitled "Termination of Employment including Death, Disability or Leave of Absence" below, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the shares of Restricted Stock awarded under your Equity Award Agreement will be deliverable to you, subject to any applicable tax withholding requirements as described in Section 9 of the Plan.

# Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

**Termination of Employment including Death, Disability and Leave of Absence**

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) in your Equity Award Agreement, all then unvested shares of Restricted Stock under your Award shall be canceled (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
Upon your death all unvested shares of Restricted Stock covered by your Equity Award Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your unvested shares of Restricted Stock shall continue to vest according to the terms of your Equity Award Agreement.

*Leave of Absence*
In the event of a management approved leave of absence, any unvested shares of Restricted Stock shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your unvested shares of Restricted Stock will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

**Dividends and Other Rights**
During the period that the Restricted Stock is held by IBM hereunder, such stock will remain on the books of IBM in your name, may be voted by you, and any applicable dividends shall be paid to you. Shares issued in stock splits or similar events which relate to Restricted Stock then held by IBM in your name shall be issued in your name but shall be held by IBM under the terms hereof.

**Transferability**
Shares of Restricted Stock awarded under your Equity Award Agreement cannot be sold, assigned, transferred, pledged or otherwise encumbered prior to the vesting of your Award as set forth in your Equity Award Agreement and any such sale, assignment, transfer, pledge or encumbrance, or any attempt thereof, shall be void.

# Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

### c. Stock Options ("Options") and Stock Appreciation Rights ("SARs")

#### i. All Option and SAR Awards

**Termination of Employment including Death, Disability and Leave of Absence**

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan):

- Any Options or SARs that are not exercisable as of the date your employment terminates shall be canceled immediately (unless your Equity Award Agreement provides otherwise), and

- Any Options or SARs that are exercisable as of the date your employment terminates (other than for cause) will remain exercisable for 90 days (not three months) after the date of termination, after which any unexercised Options or SARs are canceled; provided, however, if you are a banded executive when your employment with the Company terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
In the event of your death, all Options or SARs shall become fully exercisable and remain exercisable for their full term.

In the event you are disabled (as described in Section 12 of the Plan), any unvested Options or SARs shall continue to vest and be exercisable.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

*Leave of Absence*

In the event of a management approved leave of absence, any unvested Options or SARs shall continue to vest and be exercisable as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your Options or SARs will continue to vest and be exercisable in accordance with their terms. If you do not return to active status,

- Your unvested Options or SARs will be canceled immediately; and

- Your vested Options or SARs will be canceled on the later of the 91st day following your last day of active employment or the date of the termination of your leave of absence; provided, however, if you are a banded executive when your employment terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement.

**Termination of Employment for Cause**

If your employment terminates for cause, all exercisable and not exercisable Options or SARs are canceled immediately.

### ii.  All SAR Awards

**Settlement of Award**

Upon exercise, the Company shall deliver an aggregate amount, in cash, equal to the excess of the Fair Market Value of a share of Capital Stock on the date of exercise over the Exercise Price set forth in your Equity Award Agreement multiplied by the number of SARs exercised, subject to any applicable tax withholding requirements as described in Section 9 of the Plan. The value of the Award will be calculated in your home country currency at the exchange rate on the date the Award becomes fully vested using a commercially reasonable measure of exchange rate.

# Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

## d. Performance Share Units ("PSUs")

**Termination of Employment, including Death and Disability, and Leave of Absence**

*Termination of Employment and Leave of Absence*
If you cease to be an active, full-time employee for any reason (other than on account of death or are disabled as described in Section 12 of the Plan) before the Date of Payout (in the case of a recipient in the United States, at year end of the applicable PSU Performance Period), all PSUs are canceled immediately provided, however, if you are a banded executive when your employment terminates (other than for cause) after you have attained age 55, completed at least 15 years of service with the Company at the time of termination, and completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement), the PSUs granted hereunder shall be paid out on the Date of Payout (as set forth in your Equity Award Agreement) based on IBM performance over the entire applicable Performance Period(s), in an amount that will be prorated for the number of months completed as an active executive during the PSU Performance Period, adjusted for the performance score.

However, your unvested PSUs will continue to vest upon termination of employment or the time you cease to be an active, full-time employee if all of the following criteria are met:

- You are on the performance team, or any successor team thereto, at the time of termination of employment or the time you cease to be an active, full-time employee;
- You have completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement);
- You have reached age 55 with 15 years of service at the time of termination of employment or the time you cease to be an active, full-time employee (age 60 with 15 years of service for the Chairman and CEO);
- The Committee has certified that all performance conditions have been met; and
- Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the payout.

*Death or Disability*
Prior to the Date of Payout, (i) in the event of your death or (ii) if you are disabled (as described in Section 12 of the Plan), all PSUs shall continue to vest according to the terms of your Equity Award Agreement and the PSUs will be paid out at the end of the Performance Period based on IBM performance over the entire applicable Performance Period(s).

# Terms and Conditions of Your Equity Award:
## Provisions that apply to specific countries

## a. Denmark

### *i. All Awards*

**Non-Solicitation**
The following part of the above non-solicitation provision does not apply to those individuals with the home country of Denmark: "In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company."

# EXHIBIT D

## Long-Term Incentive Award Acceptance Information

Dear Jeffrey Doyle:

IBM's grants to you become effective only after, and are conditioned upon your accepting the terms and conditions of the award agreements, the accompanying "Terms and Conditions of Your Equity Award: Effective June 7, 2013" ("Terms and Conditions") document and the Long-Term Performance Plan ("LTPP") under which these long-term incentive awards are granted, including those provisions relating to the cancellation and rescission of awards.

If you have not read the LTPP prospectus that governs your equity awards, please do so by viewing the "Prospectuses" section of the executive compensation web site (**http://w3.ibm.com/hr/exec/comp/eq_prospectus.html**). The prospectus contains the terms of the LTPP and is the legal offering document covering IBM's stock-based awards, and you should read it before accepting your grant. In the event of any conflict between the terms of the LTPP and the information provided on this screen, the LTPP shall govern.

To record your acceptance and agreement to the terms and conditions of your award, you must press the ACCEPT button below. By pressing the ACCEPT button below, you are certifying that you have read and understand the terms and conditions of each award agreement, the Terms and Conditions document and the LTPP covering each stock-based award listed here, and that you accept and agree to all the relevant terms and conditions.

**Until you formally accept your award, Restricted Stock Units and/or Performance Share Units will not be released to you or settled at vesting and Stock Options will not be exercisable. In addition, after you accept your award and your RSU or PSU award vests, the shares (net of taxes where applicable) will typically be available for sale, and/or transfer https://www.benefitaccess.com/ within 2 business days from the vesting date. As described in the plan documents, the Company withholds taxes from your award (and/or reports income) as required by local laws. In some countries, the Company does not withhold taxes because there is no requirement to do so. Irrespective of any withholding and/or reporting by the Company, it is important for you to consult with your personal tax advisor to satisfy your individual tax obligations.**

| Award Type | Award Date | Shares / Units | Long-Term Performance Plan |
|---|---|---|---|
| Restricted Stock Units | June 7, 2013 | 358 | 1999 |

# International Business Machines Corporation ("IBM")

# Equity Award Agreement

**Cancellation and Rescission**

You understand that IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months. Refer to the Terms and Conditions document and the Plan for further details.

**Data Privacy, Electronic Delivery**

By accepting this Award, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary, and with any vendor engaged by IBM to administer this Award, subject to the Terms and Conditions document; you also consent to receiving information and materials in connection with this Award or any subsequent awards under IBM's long-term performance plans, including without limitation any prospectuses and plan documents, by any means of electronic delivery available now and/or in the future (including without limitation by e-mail, by Web site access and/or by facsimile), such consent to remain in effect unless and until revoked in writing by you.

**Extraordinary Compensation**

Your participation in the Plan is voluntary. The value of this Award is an extraordinary item of income, is not part of your normal or expected compensation and shall not be considered in calculating any severance, redundancy, end of service payments, bonus, long-service awards, pension, retirement or other benefits or similar payments. The Plan is discretionary in nature. This Award is a one-time benefit that does not create any contractual or other right to receive additional awards or other benefits in the future. Future grants, if any, are at the sole grace and discretion of IBM, including but not limited to, the timing of the grant, the number of units and vesting provisions. This Equity Award Agreement is not part of your employment agreement, if any.

**Accept Your Award**

This Award is considered valid when you accept it. This Award will be cancelled unless you accept it by 11:59 p.m. Eastern time by two business days prior to the first vesting date in the "Vesting" section of this Agreement. By pressing the Accept button below to accept your Award, you acknowledge having received and read this Equity Award Agreement, the Terms and Conditions document and the Plan under which this Award was granted and you agree (i) not to hedge the economic risk of this Award or any previously-granted outstanding awards, which includes entering into any derivative transaction on IBM securities (e.g., any short sale, put, swap, forward, option, collar, etc.), (ii) to comply with the terms of the Plan, this Equity Award Agreement and the Terms and Conditions document, including those provisions relating to cancellation and rescission of awards and jurisdiction and governing law, and (iii) that by your acceptance of this Award, all awards previously granted to you under the Plan or other IBM Long-Term Performance Plans are subject to the "Cancellation and Rescission" section of this Agreement (unless your previous award agreement(s) specified a longer Rescission Period, in which case such longer period will apply) and the "Cancellation and Rescission" section of the Terms and Conditions document.